## Case No. 14,709.

### UNITED STATES v. CALLENDER.

[Whart. St. Tr. 688; Chase's Trial, Append. 65.]

Circuit Court. D. Virginia. 1800.

INDICTMENT FOR SEDITIOUS LIBEL—PROVINCE OF COURT AND JURY — PLEADING — EVIDENCE IN JUSTIFICATION — TRIAL — CHALLENGES OF JURORS.

[1. In a prosecution for libel under the sedition law (Act 1798) the jury have nothing to do with assessing the fine in case of a conviction. That is for the court alone.]

[2. Where an indictment for libel is founded upon passages contained in a book, it is not necessary to set out the title of the book; but it is sufficient to aver that upon a date mentioned defendant did publish, etc., a false, etc., libel "of the tenor and effect following," and then set out the passages complained of.]

[3. An allegation of "tenor and effect" requires proof of the substance only, and not the precise words.]

[4. Where the accused relies upon a justification, the proof of the justification must extend to the whole charge, otherwise it is insufficient and inadmissible; and it is not competent to prove one part of the specific charge by one witness and other parts by different witnesses.]

[5. In a prosecution for seditious libel the only question which can be put to a juror challenged for favor is whether he has ever formed and delivered an opinion upon the charge against the accused: and it is improper to ask whether he has ever formed and delivered an opinion on the book in which the alleged libellous passages occur.]

[6. Principal challenges to the array, or the whole jury at once, are always for partiality in the sheriff, and not in the jurors, and such challenges are to be determined by the court: whereas challenges for favor, in the particular jurors, are to be determined by triers sworn by the court. And the fact that a partial juror has been returned is no reason for inferring partiality in the sheriff, so as to furnish ground of challenge to the array.]

[7. The court may demand a statement in writing of questions intended to be put to a witness, in order that no illegal evidence may be heard by the jury and make an undue impression.]

[8. The right of the jury in criminal cases to determine the law as well as the facts does not extend to a determination of the question whether a statute of the United States produced to them is void as contravening the constitution. The constitutionality of the law under which the indictment is found is a matter solely for the court, and counsel will not be permitted to argue that question to the jury.]

[Cited in Sparf v. U. S., 156 U. S. 70, 164, 15 Sup. Ct. 273.]

[Indictment against James Thompson Callender for a seditious libel against the president of the United States.]

The matter set out in the indictment as libellous was as follows: "The reign of Mr. Adams has been one continued tempest of malignant passions. As president, he has never opened his lips, or lifted his pen without threatening and scolding; the grand object of his administration has been to exasperate the rage of contending parties, to calumniate and destroy every man who differs from his opinions. Mr. Adams has laboured, and with melancholy success, to break up the bonds of social affection, and under the ruins of confidence and friendship, to extinguish the only gleam of happiness that glimmers through the dark and despicable farce of life. The contriver of this peace has been suddenly converted, as he said, to the presidential system, that is to a French war, an American navy, a large standing army, an additional load of taxes, and all the other symptoms and consequences of debt and despotism. The same system of persecution has been extended all over the continent, every person holding an office must either quit it, or think and vote exactly with Mr. Adams. Adams and Washington have since been shaping a series of these paper jobbers into judges and ambassadors, as their whole courage lies in want of shame; these poltroons, without risking a manly and intelligible defence of their own measures, raise an affected yelp against the corruption of the French Directory, as if any corruption would be more venal, more notorious, more execrated than their own. The object with Mr. Adams was to recommend a French war, professedly for the sake of supporting American commerce, but in reality for the sake of yoking us into an alliance with the British tyrant.— While such numbers of the effective agents of the Revolution languish in obscurity, or shiver in want, ask Mr. Adams whether it was proper to heap so many myriads of dollars upon William Smith, upon a paper jobber, who, next to Hamilton and himself is, perhaps, the most detested character on the continent.— You will then make your choice between innocence and guilt, between freedom and slavery, between paradise and perdition; you will choose between the man who has deserted and reversed all his principles, and that man whose own example strengthens all his laws, that man whose predictions, like those of Henry, have been converted into history. You will choose between that man whose life is unspotted by a crime, and that man whose hands are reeking with the blood of the poor, friendless Connecticut sailor: I see the tear of indignation starting on your cheeks! You anticipate the name of John Adams.—Every feature in the conduct of Mr. Adams, forms a distinct and additional evidence, that he was determined at all events to embroil this country with France. Mr. Adams has only completed the scene of ignominy which Mr. Washington began.—This last presidential felony will be buried by congress in the same criminal silence as its predecessors. Foremost in whatever is detestable, Mr. Adams feels anxiety to curb the frontier population. He was a professed aristocrat; he had proved faithful and serviceable to the British interest. Thus we see the genuine character of the president, when but in a secondary station, he censured the funding system, when at the head of affairs, he reverses all his former principles. He exerts himself to plunge his country into the most expensive and ruinous establishments. In the

two first years of his presidency, he has contrived pretences to double the annual expense of government by useless fleets, armies, sinecures and jobs of every possible description. By sending these ambassadors to Paris, Mr. Adams and his British faction designed to do nothing but mischief. In that paper with all the cowardly insolence arising from his assurance of personal safety, with all the fury, but without the propriety or sublimity of Homer's Achilles, this hoary headed incendiary, this libeller of the governor of Virginia, bawls out to arms! then to arms! It was floating upon the same bladder of popularity that Mr. Adams threatened to make this city the centrical point of a bonfire. Reader, dost thou envy that unfortunate old man with his twenty-five thousand dollars a year, with the petty parade of his birth-day, with the importance of his name sticking in every other page of the statute book. Alas! he is not an object of envy, but of compassion and of horror. With Connecticut more than half undeceived, with Pennsylvania disgusted, with Virginia alarmed, with Kentucky holding him in defiance, having renounced all his original principles, and affronted all his honest friends, he cannot enjoy the sweet slumbers of innocence, he cannot hope to feel the most exquisitely delightful sensation that ever warmed a human breast, the consciousness of being universally and deservedly beloved.—It is happy for Mr. Adams himself, as well as for his country, that he asserted an untruth. In the midst of such a scene of profligacy and of usury the president has persisted as long as he durst, in making his utmost efforts for provoking a French war. For although Mr. Adams were to make a treaty with France, yet such is the grossness of his prejudice, and so great is the violence of his passions, that under his administration America would be in constant danger of a second quarrel. When a chief magistrate both in his speeches and newspapers, is constantly reviling France, he can neither expect nor desire to live long in peace with her. Take your choice, then, between Adams, war and beggary, and Jefferson, peace and competency."

On Wednesday, May 28, a continuance was asked for by the defendant's counsel, upon the following affidavit:

"City of Richmond, ss. This day James Thompson Callender made oath before me, a magistrate of the said city, that William Gardner, Tench Coxe, Judge Bee, Timothy Pickering, William B. Giles, Stephen Thompson Mason, and General Blackburn, he believes to be material witnesses in his defence, against an indictment found against him during the present term of the circuit court of the United States for the middle circuit, Virginia district: that William Gardner aforesaid resides, he believes, in Portsmouth, in the state of New Hampshire; that Tench Coxe aforesaid resides in Philadelphia, in the state of Pennsylvania;

that Judge Bee resides, the deponent hath understood, in South Carolina, but in what part of the state he knows not; that Timothy Pickering aforesaid resided of late in Philadelphia, in the state of Pennsylvania, but where he resides at this time the deponent doth not know; that William B. Giles aforesaid, he hath understood since he hath been furnished with a copy of the indictment, and since the said Giles hath left town, resides in the county of Amelia; and that Gen. Blackburn resides in the county of Bath. The said James Thompson Callender further declares, that he expects to prove by the said William Gardner, and that he verily believes that he shall prove by the said William Gardner, that the said William Gardner was commissioner of loans for the state of New Hampshire, under the government of the United States, and that he was turned out of the said office of commissioner of loans because he, the said Gardner, refused to subscribe an address circulated in the town of Portsmouth, in New Hampshire, and presented to the president of the United States in the year 1798, at the instance of several inhabitants of the said town, in which address unequivocal approbation of the conduct of the said president, in the administration of the United States, is expressed.

"(2d) That said James Thompson Callender also declares, on oath, that he verily believes that he shall prove, by the evidence of Tench Coxe aforesaid, that he, the said Tench Coxe, in the year 1798, held an important office under the government of the United States, to wit, commissioner of the revenue, from which office the said Coxe was ejected by the present president of the United States, because he did not approve the measures of his the said president's administration, or the principles on which it was conducted. That he verily believes that he shall be able to prove, by the evidence of Judge Bee, that he did receive from the president of the United States, in the year 1799, a letter, in which he the said president did advise and request the said Judge Bee, then acting in his judicial character, to deliver to the consul of the British nation in Charleston Jonathan Robbins, alias Thomas Nash, who had been apprehended and carried before the said judge on a charge of murder committed on the high seas, on board the British frigate Hermione.

"He farther deposes on oath, that he verily believes that he shall be able to prove, by the evidence of Timothy Pickering, that the president of the United States was in possession of despatches from Mr. Vans Murray, American minister in Holland, containing assurances on the part of the French Republic that ambassadors from the United States would be received in a way satisfactory to the people and government of the United States, many weeks while congress was in session, before he communicated the same to congress.

"The deponent further saith, that he verily believes that he shall be able to prove, by the evidence of Stephen Thompson Mason and William B. Giles, that John Adams, president of the United States, has unequivocally avowed, in conversation with them, principles utterly incompatible with the principles of the present constitution of the United States; principles which could not be carried into operation under any political institution without the establishment of a direct, powerful, and dangerous aristocracy; that he declared, in express terms, to the said Stephen Thompson Mason, that he had no more idea that the present federal constitution could, for any length of time, control the people of the United States, than that it could control the motion of the planets; that he also declared to the said Stephen Thompson Mason, that he had no more idea that a political society could exist without a distinction of ranks, than that an army could exist without officers; and also that he can prove, by the said William B. Giles, that the president of the United States has avowed, in conversation with him, a sentiment to this effect, that he thought the executive department of the United States ought to be vested with power to direct and control the public will. That this deponent verily believes that he shall be able to prove, by General Blackburn, that he did, on the —— day of ——, in the year 1798, receive an address from John Adams, president of the United States, in answer to the field officers of Bath county, in which the said president does avow that there was a party in Virginia which deserved to be humbled into dust and ashes before the indignant frowns of their injured, insulted, and offended country. And this deponent further saith, he is advised and believes that it is material to his defence against the indictment aforesaid, that he should procure authentic copies of sundry answers made by the president of the United States to addresses from the inhabitants of the United States, in various parts thereof, which authentic copies he cannot procure, so as to be in readiness for trial during the present term. He also saith that he is advised and doth believe, that a certain book, entitled 'An Essay on Canon and Feudal Law,' or entitled in words to that purport, ascribed to the president of the United States, and of which he believes the president is the author, is material to his defence, and that he cannot procure a copy of the same, and evidence that the said president is the author thereof, without being allowed several weeks, and perhaps months, for the purpose. He further saith that he is told by the counsel who mean to appear for him, that they cannot possibly be prepared to investigate the evidence relating to the several charges in the indictment, even if all the persons and documents wanted were upon the spot."

The motion, after having been argued by Mr. Hay and Mr. Nicholas for the traverser,

and, Mr. Nelson, District Attorney, for the United States, was refused by the court, but a postponement granted till the ensuing Monday.

On Monday, the 2d of June, Mr. Callender appeared in court, attended by his counsel, Mr. Nicholas, the Attorney-General of the State, Mr. Hay, and Mr. Wirt.

The traverser being called, a postponement for a few hours was asked, until it could be ascertained whether Mr. Giles would attend or not. The badness of the weather on the preceding day, it was suggested, had probably prevented his arrival in town as early as might otherwise have been expected. The judge desired to know whether the counsel for the traverser wished a postponement for a few hours only, or until the next day, as they might make their choice. The next day was preferred.

On Tuesday, the motion for a postponement until November was renewed.

Mr. Hay said that Mr. Giles had not arrived, and that he did not then expect him. Mr. Giles would, probably, presume that the indictment was either tried or continued to the day to which he was summoned, and as he had not come on that day he could not be expected at all. Mr. H. then remarked that the court had declared the evidence of Mr. Giles to be material, not only in express terms, but by a partial postponement, and inferred that the trial ought not to take place until his personal attendance could be procured.

Mr. H. then requested the attention of the court to other reasons, which satisfied his own mind, that the motion ought to be granted.

The laws and customs of the state of Virginia were in favour of the motion. In this state when an indictment for misdemeanour is found, the party is not arrested and brought into court, but a summons issues returnable to the succeeding court. In the interval the party has time to collect and prepare the materials for his defence. It was true, as to himself, that he had long ago formed a determination to appear in behalf of the first man who should be indicted in this state for a libel under the sedition law. He had formed this resolution because he was convinced, after the most mature deliberation, preceded by a calm and temperate investigation of the subject with gentlemen who differed from him in political sentiment, but were of the first characters for talents, that the second section of the sedition law was unconstitutional. But he had never supposed the trial would take place immediately after the prosecution was commenced, and therefore, though he was ready to discuss the question concerning the "rights of the jury to decide the law of the case," and the question concerning the constitutionality of the law, he was not ready to state and to comment on the evidence on which the traverser relied. This had been

already asserted to the court. But there was another point worthy of notice. He was not ashamed to acknowledge, he said, that he was but little acquainted with the doctrine of libels. Happily for the repose of people, no instance had occurred in this state which had turned the attention of professional men to that subject. In the little time, therefore, that had elapsed since the traverser had been arrested, he had not had leisure to examine a point which appeared to him to merit some consideration.

The second section of the sedition law made falsehood as well as scandal and malice an essential part of every libel, and by the last sentence the party accused is allowed to show in his justification the truth of the matter charged to be libellous.

Mr. H. said, he would not pretend to say decidedly what ought to be the construction of that law, but the opinion which he had been able to form after a very short consideration of the subject, was, that the object of the law was to punish a man, not for abuse nor for erroneous deductions or opinions, but for "fact falsely and maliciously asserted." If this idea was correct, it became a matter of consequence to do what had never been done perhaps before, to draw a line of discrimination between fact and opinion; because if the indictment contained against the traverser charges of being guilty of error in opinion as well as falsehood in fact, it was so far defective, and ought not to be regarded in preparing for a defence, or notice by the jury in assessing the fine.

Here the judge interrupted Mr. H., and told him that he was mistaken in supposing that the jury had a right to assess the fine. It may be conformable, said he, to your local state laws, but it is a wild notion as applied to the federal court. It is not the law.

Mr. H. said that he was somewhat perplexed. He could sometimes answer arguments, but not authority; however, if he was permitted to proceed, he would state his ideas about fact and opinion, and then leave the subject to the court.

Mr. Hay said, that the observations which he was about to make, were hazarded without that deliberation to which he could wish to have recourse. He was not, however, urging an argument, but praying for time to prepare one. It seemed to him, he said, that the assertion of a fact was the assertion of that which, from its nature, was susceptible of direct and positive evidence; everything else was opinion. For instance, if one man should say of another that he stole a horse, the assertion, if true, could be demonstrated to be true by proving that he did steal a horse; or if one man said of another that he was a thief, the person making the charge might support it by proving that the party accused had taken property secretly, without the consent or knowledge of the owner. About evidence in a question of this sort, all men of common understanding would form the same opinion. But what sort of evidence would be necessary to prove the first words of the indictment, that the reign of Mr. Adams had been one continued tempest of malignant passions? The circumstances to which the writer might allude, and which satisfied his mind that Mr. Adams was intemperate and passionate, would only prove to a man of different political complexion, that he was under the influence of a patriotic, honest and virtuous sensibility. When Mr. Adams said in his reply to the people of Arlington and Sandgate, "that he had long seen the exertions of dangerous and restless men misleading the understanding of well-meaning citizens, and prompting them to such measures as would sink the glories of America, and prostrate her liberties at the feet of France,"—some might conceive that he was speaking the language of passion and malignity. Many were of that opinion,—Mr. H. himself was. He did not think that Mr. Adams could point his finger to a single man who deserved a reproach so vile. It was language calculated to exasperate the rage of contending parties. On the other hand, he was willing to admit that there were men of good sense and upright principles who really believe that the president spoke the plain truth, and that they themselves had seen such men as he had described. This was a question of opinion only, and therefore was open to endless discussion.

One instance more would completely illustrate his meaning. The indictment charged the traverser with having maliciously asserted, that the president had reversed all his principles. If this assertion could be proved, it would be necessary, 1st. To show what his principles were.—2d. What they are now. The first branch of discussion presented difficulties absolutely insurmountable. Men of different political opinions, furnished with the same materials of information, would form conclusions diametrically opposite. Let them take for their guide the vindication of the constitution of the United States. Many were perfectly satisfied that the president of the United States, instead of approving the federal constitution, was of opinion, that a government composed of an hereditary chief magistrate, and senate, and a house of commons or representatives, chosen by the people, was better calculated than any other to secure the liberties and promote the happiness of the people. Mr. Hay avowed that he had no doubt that such was the opinion of the president. But others might think, and many had said, that the fair inference was, that he was cordially attached to the principles on which the constitution of the United States was constructed. What the president's principles had been, therefore, was a question, about which there would forever be a difference of opinion; and if the assertion made by the traverser was not capable of being proved or disproved, the privilege of giving the truth in evidence was a

nullity. A jury of one party would not believe it when given; a jury of the other party would not require it to be given.

Mr. Hay concluded by saying that delay was of no consequence to the traverser. Not only his little property, but his liberty was at stake. He wished to have time to defend himself by counsel who felt competent to the task which they were to perform. As to the United States at large, an immediate trial could be of no sort of consequence, nor can it be of any moment, said Mr. H., to the party who, it is said, has been libelled. The reputation of the president of the United States must for ever rest on the opinion of a virtuous and intelligent people: and standing on its mighty basis, it could never be affected by the abuse or declamation of an individual, and that individual an obscure and friendless foreigner.

Mr. Nicholas then made a few observations.[1]

We conceive that the testimony of Mr. Giles is extremely important; he will prove, as Mr. Callender has stated in his affidavit, that Mr. Adams, the president, wished that the executive had power to control the public will.

This testimony, when compared with the books of the president, will substantiate the charges in the book written by Mr. Callender. It will go strongly to a confirmation of the charges in dispute; it goes directly to that part of the indictment, where he is charged with having said, that the president is a professed aristocrat. It has been stated, that as there are nineteen charges in the indictment against the traverser, though we prove eighteen of them to be true, yet he must be found guilty, because we do not prove the truth of the nineteenth;—but how is it possible for us to defend ourselves, or how can we be prepared for trial, if the witness, by whom we can prove that particular charge, be absent? If the court think that, in order to justify ourselves, we must prove the whole libel to be true, and it shall appear that testimony to prove a particular charge is wanting, the court will afford us an opportunity of adducing it. I conceive, with submission, that the former judgment of the court, in particularly postponing the trial, admitted the evidence of Mr. Giles to be material, and that his personal attendance would be essential to justice.

Here, CHASE, Circuit Justice, informed Mr. Nicholas that he had not apprehended the opinion of the court rightly, and that although on the application of the counsel for the traverser, the court had given them the choice of postponement of the trial till to-

day instead of a few hours; yet it was not meant by that indulgence, either to declare the testimony of Mr. Giles material, or to postpone the trial till another term, on account of his absence. Mr. Nicholas then urged once more the necessity of postponing the trial till Mr. Giles could attend. The question, he said, on a motion for a continuance, is, can the testimony of the absent witness substantiate the defence or the point in issue? How can it be done, if the witness be not present? When a witness, to prove the truth of a particular charge, is absent, I trust the court will give us time to avail ourselves of his evidence, and will not precipitate a trial, when a trial will not demonstrate that the decision is right; for if the defendant be found guilty when his witnesses are absent, and counsel unprepared, the verdict will not satisfy the public mind of his guilt.

Here CHASE, Circuit Justice, stopped Mr. Nicholas, and addressed the counsel for Mr. Callender, thus:—

It is wholly improper to go back to the former motion. Gentlemen, you misapprehend the intention of the court, in postponing the cause till to-day—you ought to confine yourselves to the present motion. Two reasons are assigned for postponing the trial: the first, that Mr. Giles is absent, and it is inferred, that the court, by not ruling a trial before, admitted his evidence to be material. The court did not enter into the question whether it be material or not. It appeared, that he was within a little distance of this place, and the cause was suspended till Monday, that Mr. Giles might be summoned, before that day, to attend. On Monday, you asked for a postponement of the trial for a few hours, and it was stated that, perhaps he might come in the course of the day. Instead of a few hours, you had choice of continuing it till to-day. Mr. Giles has been summoned, and does not attend. Regularly you ought to take out an attachment against him, for not attending, after having been served with the subpœna, and apprised, that his evidence was required by the traverser. There is no reason to believe he will be here during the term of the court: you do not expect him; if such excuses as these authorize a postponement of the trial, it must be evident that this cause will never be tried. It is not necessary to say whether Mr. Giles, if present, could be sworn or not; because the traverser is not entitled, on general principles, to a continuance. Another reason assigned is, that as the jury are to assess the fine, it is essential that the traverser should have the privilege of adducing testimony to mitigate it. This may be the practice in your own state courts. Your own court will be governed by your own laws; but it does not apply to the federal courts. The jury are not to regulate the fine. It is a mistaken idea; they have nothing to do with it. But it is stated that the counsel are unprepared to defend the traverser. You

[1] Here Mr. Robertson's report begins. The report in the Virginia Examiner makes Judge Chase refuse the motion directly at the close of Mr. Hay's speech. I have preferred Mr. Robertson's narrative, however, not only because he was a responsible reporter, but because his report was afterwards verified by him under oath.

show yourselves to be men of ability, and there is no difficulty in the cause; but you say that you are not ready to discuss the difference between fact and opinion: that the charges in the indictment are merely opinion, and not facts falsely asserted. Must there be a departure from common sense, to find out a construction favourable to the traverser? This construction admits the publication, but denies its criminality. If the traverser certainly published that defamatory paper, read it and consider it. Can any man of you say, that the president is a detestable and criminal man? The traverser charges him with being a murderer and a thief, a despot and a tyrant! Will you call a man a murderer and a thief, and excuse yourself by saying it is but mere opinion— or, that you heard so? Any falsehood, however palpable and wicked, may be justified by this species of argument. The question here is, with what intent the traverser published these charges? Are they false, scandalous, and malicious, and published with intent to defame? It is for the jury to say, what was the intent of such imputations, and this is sufficiently obvious. The cause must be tried. I am sworn to do justice between the United States and the prisoner at the bar. I do not dictate to you how you are to defend him, but you must defend every man according to the law; and without intending any disrespect to either of you, I must confine you to what I think the law.

The marshal was then ordered to call the jury.

Mr. Nicholas.—We mean to challenge the array and take every advantage which the laws of the country give us. In support of this doctrine, I will read a passage from "Trials per Pais." (Here he read the passage.) I believe there is testimony in court to prove that one of the jurors returned by the marshal, has expressed his sentiments hostile to the traverser. It is like a case stated in the books, where a verdict was set aside, because a juryman had previously said, that the man accused ought to be hanged; and in that case, on the second trial, every juryman was called to say, whether he had formed any opinion on the subject or not?

CHASE, Circuit Justice.—My construction of the law is quite the contrary. I have always seen triers sworn to decide these questions. How is this done in your country? Challenges for favour must be decided by triers. I suppose there must be triers sworn.

Mr. Nicholas.—I believe the books lay down this distinction. Challenges to the array are either principal challenges, or challenges for favour;—causes for principal challenges are always tried by the court; challenges for favour are always tried by triers.

CHASE, Circuit Justice.—Well, sir, your challenge is for favour, because you state the juror to be unfavourable to the traverser.

Mr. Nicholas.—This book states it as a cause of principal challenge.

CHASE, Circuit Justice.—Show me that book: it is not the best authority. Have you Coke upon Littleton in the house? If I had it we would see the whole doctrine at once. I am persuaded that Coke upon Littleton states, that challenges for favour must be decided by triers. The oath of the triers is laid down there. Challenges to the array are for partiality in the sheriff.

Coke upon Littleton being produced, and the judge having examined it, observed, the case is clear. Principal challenges to the array, or the whole jury at once, are always for partiality in the sheriff, and not in the jurors.

Mr. Nicholas said, that the law might perhaps consider the return of a partial juror, as sufficient to ground a challenge to the array, on the principle of partiality in the sheriff, and wished to know if he was correct in this idea of the law.

CHASE, Circuit Justice.—No sir, the law is not so. You must proceed regularly. You may bring in proof if you can, that any juror has delivered his opinion upon that case heretofore; or you may examine the juror himself, upon oath, to this effect. You may do either, but not both; and this alternative offered, you must consider not as a strict right.

The counsel chose to rely on the jurors themselves.

The first juror was sworn, and the judge put the following question to him: "Have you ever formed and delivered an opinion upon the charges contained in the indictment?" The juror answered, that he had never seen the indictment, nor heard it read. The judge then said, he must be sworn in chief.

Mr. Hay asked permission to put a question to the juror before he was sworn in chief. The judge desired to know what sort of a question he meant to put, and told him he must first hear the question, and if he thought it a proper one, it might be put.

Mr. Hay.—The question which, with the permission of the court, I meant to have asked, is this: "Have you ever formed and delivered an opinion on the book entitled, 'The Prospect Before Us,' from which the charges in the indictment are extracted?"

CHASE, Circuit Justice.—That question is improper, and you shall not ask it. The only proper question is, "Have you ever formed and delivered an opinion upon this charge." He must have delivered as well as formed the opinion. Such a question as you propose, would prevent the man from ever being tried —the whole country have heard the case, and very probably, formed an opinion. You might mislead men by your ingenuity; and if you were indulged in putting the question, the traverser might never be tried. He has answered, that he never saw the indictment, nor heard it read, and if he has neither read nor heard the charges, I am sure he cannot have formed or delivered an opinion on the subject.

Mr. Hay then asked, that the indictment might be read to the juror, because, perhaps,

when he heard and understood the charges, he would answer, that he had both formed and delivered an opinion upon them.

The judge replied, that the court had already indulged him as far as they could. That the answer of the juryman was explicit —that they could not go further than they had gone, and that he ought to be satisfied.

The juryman was then sworn in chief, and the issue was explained, that it must be proved that the traverser wrote or published the book—that the charges were false, scandalous and malicious, and that he wrote them with intent to defame, and that if he could prove the charges he must be acquitted. The same question, "whether they had formed and delivered an opinion on the charges against the traverser," was put by the judge, to eight of the other jurymen successively, before they were sworn in chief, and they all answered in the negative.

The counsel for the traverser said, that it was unnecessary to put this question to the other three jurymen, and they were accordingly sworn in chief immediately. The eighth juror answered, when the previous question was put to him, that though he had never read or heard the charges in the indictment, and knew not what the traverser had published, yet he had formed an unequivocal opinion, that such a book as "The Prospect Before Us," came within the sedition law. But no objection was made to him, and he was sworn like the rest.

The indictment was then read by the clerk. Mr. Nelson, the district attorney, then said: I shall not attempt, gentlemen of the jury, to excite your passions or inflame your feelings. I shall endeavour to be cautious, and avoid uttering what ought not to be said, which may in any manner influence your judgment, upon your oath; for in that office which I hold, which is that of the people of United America, it is more than a common duty, to take care not to step beyond that line which leads to justice. To that state in which your passions shall be; to such feelings as you shall possess, after hearing the charge contained in the indictment, the evidence in support of it, and a fair statement and representation of the case, I shall leave and entrust the case. In the present state of the business, it will be proper for me to call your attention to the statute or act of congress, which relates to this case.

Here Mr. Nelson read the second and third sections of the sedition law. [Lyon's Case, Case No. 8,646, and note.]

Upon this statute James Thompson Callender is now indicted, and the indictment charges that, maliciously designing and intending to defame the president, he, James Thompson Callender, did publish the libel set forth therein, with intent to bring him into contempt and disrepute, and to excite the hatred of the good people of the United States towards him. It will be for you, gentlemen of the jury, in this case to determine whether the traverser has, or has not, been the publisher of this paper. This point being ascertained, it will be for you to consider with what view, and for what purpose, a paper like this has been composed and published. If you believe it to be a candid and fair discussion of constitutional subjects, of real grievances, or of political opinions and principles generally, you will not consider it to be a libel within the statute. If you believe the facts and allegations averred in the paper are true, you will consider that the traverser hath defended himself according to the statute; but if, from internal evidence in the paper itself, you do not think so, you do not believe it to be a candid evidence and fair discussion of constitutional subjects, real grievances, or political opinions and principles, and that it does not contain the truth in all parts, you must find the traverser guilty. You will take the paper into your room with you, and consider it coolly and dispassionately, free, and discharged from all that you may have heard abroad respecting it, and determine in your minds whether it be possible to give it any other construction than that which the indictment has ascribed to it. To me it seems impossible that the extremest ingenuity can show that it was written for any other purpose. However, gentlemen of the jury, to you I submit the calm examination of the paper, upon the paper itself, and this business as to the libel which, or such parts of which, as are charged in the indictment, I shall lay before you, after it shall be proven by witnesses, who will be produced to show that James Thompson Callender, the traverser, did publish this paper; and, in laying it before you, I will make such observations as may seem to me proper and necessary to be made.

Mr. Hay understood that some of the witnesses who are to be examined to prove the guilt of the accused, were themselves, in the estimation of the law, equally guilty; that they have printed, though they had not written the libel in question. He would, therefore, beg leave to make it known to those who were in any degree implicated, that they are not bound to accuse themselves, and may withhold, if they think proper, such part of their evidence as has a tendency to criminate themselves.

CHASE, Circuit Justice.—This is correct. Every person concerned in the publication is protected by law from compulsion to criminate himself; but, I suppose, if any of them give his evidence, the government of the United States is pledged not to institute a prosecution against him. Of this he may be assured.

Mr. Nelson then called Wm. Duval, who said that he saw Mr. Henry Banks have the book called "The Prospect Before Us"; that Mr. Banks gave him the book to read; that the next day he saw Mr. Callender, who told him that he must pay him a dollar for the book given him by Mr. Banks; that he did

then pay the dollar for it to Mr. Callender; and that the book, he believes, contained some of the charges in the indictment.

Mr. Banks was then called.—He declared that, some time ago, he had become a subscriber to the book entitled "The Prospect Before Us," and paid the money at the time of subscription; that he lent the book to Major Duval, and sent to inform Mr. Callender, that he might get the money for it of Major Duval, and that he could get another copy himself another time; that he got from Mr. Callender the copy he delivered to Major Duval; that he never heard the traverser acknowledge that he was the author, but that his opinion upon the subject was clear.—The judge told him that his opinion was no evidence against the traverser.

Wm. Burton was next called.—He said that he purchased such a book from Mr. Pleasants (who is a bookseller as well as a printer); that he paid the money to Mr. Pleasants, and Mr. Callender was present.

Wm. A. Rind was next called.—His testimony substantially was, that a copy of the book in question, then in court, belonged to him; that, a considerable time ago, Mr. Lyon applied to them to print the National Magazine; that they entered into contract for the purpose of printing twenty-two sheets of that, or an equivalent in other work; that, after a great part of the magazine had been printed, it stopped, either for the want of paper or some other cause; that Mr. Lyon then brought "The Prospect Before Us"; that they printed four or five half-sheets of it; that the proof-sheets were sent to Mr. Callender for correction, and returned corrected in his handwriting; that Mr. Callender once corrected a proof-sheet in a large room at the office; that Mr. Callender came once to hurry the work, and said he would pay, but that he considered Mr. Lyon as paymaster; that, at Mr. Dixon's office, Mr. Callender said he would give him twenty copies if he would read one through, as he was sure it would convert him; that a small part of the manuscript remained in his possession, which he believed to be the handwriting of Mr. Callender. Being asked if he had ever seen Mr. Callender write, he said he had; that Mr. Callender once took the debates in the house of assembly for them.

The book and manuscript sheets were then compared, and found to correspond; this occupied some time, and the judge took some pains in examining and comparing them.

Meriwether Jones said, that he had never read the book till after the presentment was made, except a few passages, and perhaps about thirty-three pages; that not a word of it was printed at his office, though he sold some of the copies for the benefit of Mr. Callender; that he only possessed one copy (which he then showed), and which he declared he found where Mr. Callender generally kept his papers; that whenever he sold any of the books, Mr. Callender received the money; that he kept a memorandum of the money he received that he might know how much he owed him; that he could not positively say whether Mr. Callender was the author of the book or not; that he had never told him he was, though he had his opinion and belief on the subject; that he had published proposals to print the book, and, afterwards, that he had them for sale, but he did not recollect whether he published that he had them for sale for the benefit of Mr. Callender, though the fact was so; that the strongest proof he had of Mr. Callender being the author, was a conversation that he had with him respecting that part of the book where, speaking of Washington and Adams, it used the term poltroons; Mr. Callender said he alluded to some who had received appointments from them, and not to themselves.

Thos. Nicholson said, that Mr. Callender had called at his house to engage him to publish a part of the book; that he could not do it then; that he called on him the next day, accompanied by Mr. Meriwether Jones, for whom he was then engaged to print; that Mr. Jones told him that he might suspend his work, which he was then engaged in, to do Mr. Callender's; that he printed seven pages of the book, that Mr. Callender paid him for it, and he understood it was for his emolument.

John Dixon said, that he printed the greatest part of the book (about 120 pages) at the request of Mr. Lyon, and that Mr. Callender corrected the proof-sheet.

Jas. Lyon's evidence was, that he did not know that Mr. Callender was the author of the book, but that he knew him to be the publisher of it, jointly with himself; and that he probably (but he did not recollect certainly) had furnished Mr. Rind with the copy of the book; that Mr. Callender corrected the sheets from the press; that he never saw Mr. Callender writing, but supposed, from having seen the manuscript, and some writing which was (said to be) written by him, that he wrote it.

Samuel Pleasants deposed, that he had sold copies of this book; he understood that the books were sent to him from the book-binder, for Mr. Callender; that he received both the money and the subscription papers for him, and paid him the money he received; that he sold, perhaps, a hundred copies.

The oral testimony of the United States being finished, the attorney for the United States was about to point to the jury the passages in "The Prospect Before Us" corresponding with the charges in the indictment, when Mr. Hay objected to the introduction of that book.

I conceive, he said, that this book cannot be adduced in evidence, in support of the charges stated in the indictment. Perhaps my stating to the court the reasons which have led me to this conclusion, may subject me to the imputation which has more than

once fallen from the bench. It has been the pleasure of the court to observe, that the defence had been conceived and continued in error. What I am about to say will not, perhaps, induce the court to change that opinion. It is with great diffidence I address the court on a subject which I have not had sufficient leisure to investigate. If, unfortunately, my conception of this law be mistaken, I hope I shall be excused, and that the reprimand will not be severe, when it is recollected that I have had not sufficient time for a full examination of the case. The position for which I contend is, that the book entitled "The Prospect Before Us" cannot be given in evidence in support of the indictment. The title of the book is not mentioned in the indictment. It states, that "on the first day of February, one thousand eight hundred, the traverser did write, print, utter, and publish, a false, scandalous, and malicious writing against the president of the United States, of the tenor and effect following: 'The reign of Mr. Adams,' &c." In prosecutions for libels in the English courts, great strictness is observed; the difference of a single letter between the words of the indictment and those in the written or printed paper adduced in evidence, is fatal; and when "tenor and effect" are inserted, all the authorities concur in declaring, that they impose on the prosecutor the necessity of proving the very words in the indictment. The first charge in the indictment is for a libellous writing of the following tenor: "The reign of Mr. Adams has been one continued reign of malignant passions." The book which is introduced in support of this charge begins differently, and contains a hundred other pages, and many pages besides, and is not named in the indictment. The position for which I therefore mean to contend is, that when libellous passages are extracted from a book which has a name by which it can be described, it is the duty of the prosecutor to describe the book by that name; for instance, he ought, in this case, to have stated, that the party accused had published a false, scandalous, and malicious writing, entitled "The Prospect Before Us," containing, among other things, the passages complained of. There are two strong reasons to support this doctrine. The first ground on which I rest the validity of this observation is, that the practice has been invariably so. I have taken the trouble of examining fifteen or twenty cases, in all of which the books from which libellous passages were taken, had a name or title, and the prosecutor described every one of them by the name which the author had chosen to give it. From these I will select three cases, to show that the description of the libellous writing by the title given it by the author, has been deemed essentially necessary, the first of which was remarkable for the length of the title; the second, where the paper contained the libel, had a number as well as a title, and both the number and the title were recited. (Here Mr. Hay showed from a book concerning libels, that the title in those two cases, and the number in the latter of them were recited.) And the third, where the libel was published in the French language, in which case the title, though lengthy, was recited in that language, and then in English. In page 87 of the same book there is a history given of a prosecution by information against the Chevalier de On, for publishing a libel against the Count de Guerchy, ambassador from France. The prosecution was commenced in the court of king's bench. The information states the title, the name of the libel fully and literally, as it was published in French, and then states the translation in English at full length. I bring forward these cases to prove what the practice is; and it is an observation of one of the best judges that ever sat in the king's bench, Lord Holt, that "the form of pleading is evidence of what the law is." If, then, it be the practice to recite in the indictment the name, to describe the title of the book, or libel published; if this has been the invariable practice ever since the unhappy prosecutions for libels took place in that country—I believe there is no doubt but the title of this book ought to have been stated in the indictment. I have learned to think with diffidence, but I am firmly persuaded that the attorney for the United States cannot give a single case from the English books of a contrary practice: and with respect to prosecutions in the United States, I know not what the practice may be in the few instances that may have occurred. It appears, too, that substantial reasons, founded on principles of sound law, and sound justice, can be adduced in support of this practice. A principle on which I rely to explain this practice to be correct, is, that it is a universal rule of law, that if a man's words, spoken or written, be made the foundation of a charge against him, the whole should be taken together. If the whole writing charged to be libellous, be stated in the indictment, it will be in the power of the defendant to resort to other passages of the same book to explain it.—If the defendant were indicted for publishing "The Prospect Before Us," he could resort to other parts of the book for an explanation. It was the duty of the attorney for the United States to have done so; as he has omitted it, he ought to be precluded from producing it in evidence.—I will now state the other reason, in support of my objection to the admissibility of this book as evidence: It is founded on this principle which hath always prevailed, or was supposed to prevail in criminal law, that in all criminal cases, the offence should be described with all possible accuracy and precision. In felony, it is necessary to insert in the indictment the goods and chattels alleged to be stolen, as well as the name of the person to whom they belong. The reasons are furnished by the books, why this preci-

sion is deemed necessary; the first, that the defendant may know the charge against him, and be able to defend himself; the other, that he may plead the conviction or acquittal in bar of a subsequent prosecution for the same offence. Here he referred to Hawkins' Pleas of the Crown (page 322) as authority. The defendant is charged with writing and publishing a libel of "the following tenor and effect": and but very few passages are selected from the book, which bear but a very little proportion to the extent of the whole of it. I ask, how is the defendant to know whether these few passages were taken from "The Prospect Before Us," or from some newspaper, in which they have been republished by some person, for whose conduct he was not responsible? Unless the charge be accurately specified, it is impossible for him to defend himself. In support of this indictment, evidence as to either case might be brought forward.—If in the indictment he had been charged with publishing a book, entitled "The Prospect Before Us," he would have known with an absolute certainty and demonstration, (by the copy with which he had been furnished,) what was meant to be proved against him, and what was necessary for him to prove in his own vindication; as this is not the case, and as he was not bound to know whether the passages were taken from the book or a newspaper, containing extracts from it, in the publication of which he had no concern, and for which he is under no responsibility, he ought to be sheltered by law from this evidence, which is attempted to be introduced against him. The second reason has made a great impression on my mind, and yet retains its influence. I conceive, that one writing against the president, containing fifty libellous passages, if published at the same time, can be but one act, and if there be but one act, there can be but one prosecution; if the present indictment had mentioned the title of the book, and the very passages relied on as parts of this book, the decision of this jury and this court which is about to be pronounced in this case, might be pleaded in bar to any subsequent indictment, for the same or any other passages in the same book. It is no argument to say, that there will be no subsequent prosecution; in times like these, it is impossible to predict what may be attempted, and if such a prosecution were to take place, I should not be more surprised than I am at present. If the title of the book had been inserted in this indictment, and a subsequent indictment were to be brought forward, I know that the defendant would plead in bar, that he had been formerly convicted or formerly acquitted; and the production of the record alone would protect him; but if the title of the book is not to be recited, the record will not be conclusive, and a second prosecution may take place: for the second indictment, compared with the present record, will contain no internal evidence, that the traverser had been formerly tried for the same offence, but he must resort to oral testimony, to prove that this book had been given in evidence against him at a former trial; and he might not be able to procure witnesses, whose testimony would be sufficient to establish this point. These are the reasons which induce me to think that this book ought not to be admitted to go in evidence to support the charges in the indictment. This principle has a considerable operation in questions of private property. In an action of debt, if a bond or writing be the ground of the action; if there be the most minute variance between the bond or writing stated in the declaration, and that which is adduced in evidence in support of it, the party must suffer a nonsuit. If this precision and minute attention to accuracy be required in actions of property between man and man, is it not infinitely more important that the same principles should govern in criminal cases? If the argument be good in one case, it appears to be irresistible and omnipotent in the other.

Here CHASE, Circuit Justice, requested Mr. Hay to point out these parts of the authorities referred to, on which he relied to establish his doctrine.

Mr. Hay.—If the court will have a little patience I will find the places.

CHASE, Circuit Justice.—I will have a great deal.

Mr. Hay.—The authorities I rely on are, Hawkins' Pleas of the Crown (page 322), and Salkeld's Reports (page 660). In this last book it is adjudged that when an indictment uses the words "secundum tenorem et effectum," it binds the prosecutor to a literal recital; and any the least variance between the charge in the indictment and evidence offered to support it is fatal. The case I here refer to was an information for a libel: "In which libel were contained divers libellous matters secundum tenorem et effectum, and in setting forth a sentence of the libel, it was recited with the word 'nor' instead of the word 'not,' but the sense was not altered thereby. The defendant pleaded not guilty, and this appearing upon evidence, a special verdict was found, and the court held that the word 'tenor,' imports, a 'true copy,' and that the variance was fatal; for 'not' and 'nor' are different; different grammar, and different in sense; and Powys' Justice held as to the point where literal omissions, &c. would be fatal; that where a letter omitted or changed makes another word, it is a fatal variance; otherwise where the word continues the same; and in the principal case no man would swear this to be a literal copy." It appears from well established authorities that the words "in manner and form following," do not bind the prosecutor to recite exactly, but the word "tenor" hath so strict a technical meaning, that it binds him to a literal copy. These principles certainly apply to the case before the court. The words

"tenor and effect following" are stated, and the evidence is variant.

Here CHASE, Circuit Justice, interrupted Mr. Hay, and spoke to this effect: You are certainly mistaken in your statement of the law, as applied to the case now before the court. In the cases you mention there is really a variance between the indictment and the evidence. Your objection is, that there is a variance between the thing charged in the indictment and the writing offered in evidence. But this case is very different; there is no variance. To ascertain this point I will state the indictment, and compare it with the law on which the prosecution is founded. The indictment charges, that the traverser, "maliciously intending to defame the president of the United States, and to bring him into contempt and disrepute, and to excite the hatred of the good people of the United States against him, did wickedly and maliciously write, print, utter and publish, a false, scandalous and malicious writing, against the president of the United States, of the tenor and effect following, that is to say: 'The reign of Mr. Adams has hitherto been one continued tempest, &c.' Now what is the law? The act of congress provides among other things that, 'if any person shall write, print, utter or publish, or shall cause or procure to be written, printed, uttered or published, any false, scandalous and malicious writing or writings, against the government, or either house of the congress, or the president of the United States, with intent to defame the said government, or either house of congress, or the said president, or to bring them, or either or any of them, into contempt or disrepute, or to excite against them the hatred of the good people of the United States, &c.'" The indictment charges the defendant with publishing a false, scandalous and malicious writing against the president, and the law provides against the publication of false, scandalous and malicious writings against the president.—The offences stated in the indictment correspond with those expressed in the law; the question then is, whether the name of the book in which such false, scandalous and malicious writings are published, must be recited in an indictment against an offender? It brings it to this point—Is it necessary that the title of the publication should be examined before it can be ascertained that it comes within the law? Any false, scandalous and malicious writing published with intent to defame, is provided against by law, whatever may be its title or name, or whether it have any name or not. I know that cases can be produced where the title of the libel is recited in the indictment. I remember one case where a man was indicted for publishing a libel called "The Nun in her Smock;" but it was not necessary to mention the title of the libel in that case, nor is it essential in any. Why is it necessary that every charge against a defendant should be explicit? It is that he

may clearly comprehend it, and be prepared to make his defence: it is not necessary for this purpose to recite the name of the libel. The charge against the traverser is very explicit, and he well understands and is prepared to defend it; but it is no censure on his counsel that they urge this argument in his favour. You argue further, on a supposition, that if a subsequent prosecution were to be instituted for the same offence, the verdict and judgment now to be rendered could not be pleaded in bar. It requires very little legal ability to demonstrate that the title need not be recited; and it is equally easy to prove that the decision in this case may be pleaded in bar of any other prosecution for the same offence. The attorney for the United States must prove that the traverser did publish a false, scandalous and malicious writing, with intent to defame the president. This can be done without reciting the title; and if he supports by the evidence any entire charge—if he proves that the traverser did publish any false, scandalous and malicious writing, it will be sufficient to support the indictment as to that charge, but he must be acquitted of the other charges: and the charges of which he may be found guilty, can be easily compared to charges in any subsequent indictment. This is quite different from the cases where there is an actual variance between the paper charged, and the paper offered in evidence. I understand that difference to be, that where the prosecutor undertakes to say that certain precise words have been published, he must establish them; but when he states words of the tenor and effect following, he will only be obliged to prove the substance;[2] but you insist that the whole original, including the title, must be copied in the indictment verbatim et literatim. I wonder you did not add et punctuatim also. There is no real variance, and there is an end of the objection. You are mistaken.—I pronounce this to be the law, and I shall instruct the jury, that they may find the traverser guilty of part of the charges, and acquit him of such as are not proved.

CHASE, Circuit Justice, then informed the attorney for the United States, who was about to rise to prove the admissibility of the book as evidence, that it was unnecessary for him to make any reply, and there was no good reason to exclude it; that all

---

[2] This position, notwithstanding the boisterous way in which it is laid down, is incorrect. There must be always at common law an exact recital of the alleged libellous matter, unless in the indictment itself the pleader excuses himself from so doing on the ground of the destruction of the instrument, or its possession by the defendant. See the authorities collected in Whart. Prec. of Ind. 545. "Tenor and effect" exacts a literal recital. Ford v. Bennett, cited 1 Ld. Raym. 415; Rex v. Bear, 2 Salk. 417. At the same time, Mr. Hay's position, that the title must be set out, is not sustained by the authorities, though it is clear that in knocking it down, Judge Chase knocked down nearly the whole law of libels besides.

that was necessary to be done on the part of the United States was to prove the charges to be true, and the book called "The Prospect Before Us" was good evidence to support it.

Mr. Nelson.—Although the paper is long and complicated, the testimony is not so. The testimony, as I stated to you before, is concise, plain, and correct. If there be a man who, now that he has heard that testimony, entertains a doubt whether this libel was published by the traverser, it will be useless for me to address him; if there be a man who doubts on that point, his mind must be imperviable to the traits of truth; his mind must be panoplied o'er with doubt, skepticism and prejudice. If no doubt remain on this point, the question first in order to be examined is decided: whether there be room for doubt, a summary review of the testimony will ascertain. Can there be a doubt —when all the witnesses have concurred in establishing this one point — that James Thompson Callender corrected the proof-sheets? Can there be a doubt, when those who sold the copies of the book have all said that they sold them for his benefit, and that he received the money? When it has been proved that he received the money from one purchaser himself, and that he paid for printing part of it—that part of the manuscript is in his own hand-writing—can there be any doubt?—And when, in addition to this, one witness declares that he knew him to be a joint publisher with himself, and another witness declared, that he explained the meaning of a certain term, supposed to be ambiguous in its application, is it possible to entertain any doubt? Thus stands the evidence as to the publication. It will be proper for me, gentlemen of the jury, to state to you what is a publication in point of law, as to writing or printing: that the direct or indirect circulation or emission of a libel, is a publication thereof, in law and in fact, has never been questioned in a court of law. If it appears to you that James Thompson Callender did not directly or indirectly emit or circulate this paper, then is he not the publisher thereof; if he be not the publisher directly nor indirectly thereof, then ought he to be acquitted: and if he be the publisher, and the intention thereof be not criminal, that is, if the matter therein contained be not false, scandalous and malicious, still ought he to be acquitted; but if he be the publisher, and the matter be libellous, that is, false, scandalous and malicious, the intention must be wicked and criminal, and you must find him guilty. For the questions you are to try, gentlemen of the jury, are: Was this paper published by the traverser? Was the intention criminal? that is, is the matter false, scandalous and malicious? The evidence which you have heard ascertains the first question, and an examination of the paper, or such parts of it as are laid in the indictment, will decide the second question. Whether your hearts are at ease—whether your passions are untouched—whether your feelings are unaffected, now that you have fully heard the charge, you best know. It remains only now for me, gentlemen of the jury, to call upon you, in the name of your country, whose interest you are to defend whilst you protect the rights of the individual. I call upon you in the name of your God, a portion of whose justice you are about to administer, and on your oaths, uninfluenced by favour, partiality, prejudice or affection, to discharge your duty to your God, to your country, and to yourselves.

Here Mr. Nelson read the first charge in the indictment, and proceeded to comment at great length upon the libellous passages, sentence by sentence. I have told you he closed by saying, and again repeat, that it is the peculiar privilege of every citizen of this happy country to place confidence in whom he pleases, and at the constitutional periods of making new elections, to withdraw his confidence from a former representative, and place his trust in another; and even expatiate on the virtues of the new candidate; but this does not warrant him to vilify, revile, and defame another individual, who is a candidate. Cannot a good thing be said of one individual, without saying black and damnable things of another? Is it necessary, in order to recommend one man to the presidential office, that you should charge another with bringing on his country war and beggary? The whole forms a perfect chain of malice, falsehood, and slander. Thus have I made, gentlemen of the jury, a calm, uncoloured statement of facts. I have not highly varnished, nor have said anything but what is consistent with truth. What impression the evidence or charge may have made on your minds, whether your feelings be affected, you and each of you know best. It remains only now for me, gentlemen of the jury, to remind you, that you are not only to protect the interests of your country, but to defend the rights of that individual; and in the name of God and of your country, I call upon you to discharge your duty to both and to yourselves.

The attorney for the United States having concluded, the counsel for the traverser introduced Colonel John Taylor (of Carolina county) as a witness, and he was sworn; but at the moment the oath was administered, the judge called on them, and desired to know what they intended to prove by the witness. They answered that they intended to examine Colonel Taylor to prove that he had avowed principles in his presence which justified Mr. Callender in saying that the president was an aristocrat; that he had voted against the sequestration law, and the resolutions concerning the suspension of commercial intercourse with Great Britain, by which he defeated every effort of those who were in favour of those beneficial measures which were well calculated to promote the happiness of their country.

The judge demanded a statement in writing of the questions intended to be put to the witness.

Mr. Nicholas remarked, that the traverser was at least entitled to every indulgence which had been shown to the attorney for the United States; that this requisition had not been made of the attorney, when he introduced witnesses on behalf of the United States, nor was it according to the practice of the state courts; that he wished the witness to state all he knew that would apply to the defence of his client; that he did not know what the witness would precisely prove, but that if the court insisted upon it, he would furnish a statement of the questions which he should first propound, but requested that he might not be considered as confined, in the examination of the witness, to the questions so stated.

CHASE, Circuit Justice.—It is right to state the questions intended to be propounded to witnesses, in all cases, and the reason is extremely plain. Juries are only to hear legal evidence, and the court are the only judges of what is or is not legal evidence, to support the issue joined between the parties. To say that you will correct improper evidence, after it shall have been given, is improper, because illegal evidence, once heard, may make an undue impression, and, therefore, ought not to be heard at all by the jury; and the attorney for the United States had, in opening the cause, stated the purpose for which he introduced the witnesses.

CHASE, Circuit Justice, having received a statement of the questions meant to be put,[3] and which were propounded by Mr. Nicholas, declared Colonel Taylor's evidence to be inadmissible. No evidence, said the judge, is admissible that does not go to justify the whole charge. The charge you mean to justify by this witness, as I understand you, is, that the president is a professed aristocrat, and that he has proved serviceable to the British interest. You must prove both these points, or you prove nothing. Now as you do not attempt to prove the whole of one specific charge, but only a part of it, your evidence cannot be received; this is the law, both in civil and criminal cases; he who justifies, must justify an entire charge, or else his defence does not amount to a justification in law. You have not proved the truth of any particular charge, though in order to excuse it, you must prove the whole; to prove the truth of a part only, is not proving what is material. The attorney proposed to prove

[3] Ques. 1st. Did you ever hear Mr. Adams express any opinion favourable to monarchy and aristocracy: and what were they? Ques. 2d. Did you ever hear Mr. Adams, whilst vice president, express his disapprobation of the funding system? Ques. 3d. Do you know whether Mr. Adams did not, in the year 1794, vote against the sequestration law, and the bill for suspending commercial intercourse with Great Britain?

his indictment. He has exhibited his oral and written testimony to prove it. The traverser excuses himself from the imputed guilt, by averring that part of some of the charges is true. Is this evidence proper when the whole charge is in issue? If it be, the proof of a very trivial part of an important indictment would excuse from the whole; but I pronounce the law to be otherwise, and take the responsibility on myself, and risk my character on it. It may be said that this will preclude the party from the privilege of his testimony; but this will only be a misrepresentation, it precludes them from no legal benefit. My country has made me a judge, and you must be governed now by my opinion, though I may be mistaken; but if I am not right, it is an error in judgment, and you can state the proceedings on the record so as to show any error, and I shall be the first man to grant you the benefit of a new trial by granting you a writ of error in the supreme court. It is on these grounds that I reject the evidence of the gentleman. The very argument assigned by the young gentleman who spoke last, has convinced my mind that I am right. The offered testimony has no direct and proper application to the issue; it would deceive and mislead the jury; an argumentative justification of a trivial, unimportant part of a libel, would be urged before a jury as a substantial vindication of the whole. You would, by misleading the jury under such illegal testimony, destroy public treaties and public faith; and nothing would be more uncertain than law, were such an illegal excuse admitted in courts of law.

Mr. Nicholas suggested that it might be proper to prove one part of a specific charge by one witness, and another part by another, and thereby prove the charge.

CHASE, Circuit Justice, in answer, repeated some of his former arguments, and added, that the very argument suggested by the young gentleman who spoke last, convinced his mind that it would be improper to admit the testimony now offered to the court; that to admit evidence, which went to an argumentative establishment of the truth of a minute part of the charge by one witness, and another minute part by another witness, would be irregular, and subversive of every principle of law; that it had no relation to the issue; that it was a popular argument, calculated to deceive the people, but very incorrect.

Here GRIFFIN, District Judge, being called upon by CHASE, Circuit Justice, to deliver his opinion on the question before the court, declared that he concurred with his brother judge.

CHASE, Circuit Justice, then observed: This is a new doctrine, inculcated in Virginia. You have all along mistaken the law, and press your mistakes on the court. The United States must prove the publication, and the fallacy of it. When these things are done,

you must prove a justification, and this justification must be entire and complete, as to any one specific charge; a partial justification is inadmissible. I am happy to find that my brother Judge GRIFFIN concurs with me in opinion.

The counsel for the traverser again desired to be heard on the subject.

Mr. Hay spoke thus: The question before the court is, whether this evidence goes to prove the truth of the whole charge? The opinion given by the court I understand to be, that evidence cannot be produced by the traverser to prove the truth of a part of a charge; but if evidence could be adduced to prove the whole, then such evidence would be admissible. One specific charge is twofold; that the president is an aristocrat; and that he proved serviceable to the British interest. The evidence, we suppose, will support this charge; we wish to prove the truth of the whole charge if we can, though I do not know that it is in our power. The evidence, we have reason to believe, goes first to prove that he is an aristocrat, and secondly, that he did prove serviceable to the British interest; if the testimony will in fact prove these two points, whatever may be the opinion of the court, I do not hesitate to say that, in my estimation, it will fully excuse and justify the traverser; if we can prove that the president has avowed aristocratical sentiments in conversation, and that he did in reality prove faithful and serviceable to the British interest, the traverser must be acquitted of this charge. As to the first part, I can prove by the words of Mr. Adams, published by himself, in his book called "A Defence of the American Constitution," that he thinks a government of three parts, a king, lords, and commons, the best in the world. Suppose, in addition to this, it could be proved that a law passed the house of representatives of the United States, to sequester British property; and suppose that one-half the senate of the United States were in favour of it; and that the policy of passing the law was advocated by the best and wisest men in this country, who have the same pretensions to patriotism and virtue that Mr. Adams has, but that its passage was prevented by the casting vote of Mr. Adams as speaker of the senate, would not the traverser be justified as to this charge? Would it not demonstrate that he proved serviceable to the British interests? By the answers to the first and third questions we expect to prove both these points.

Here Mr. Nelson objected to the introduction of such testimony, as being altogether inadmissible; that gentlemen ought to reflect that, if such evidence as this was to be received, any other testimony, however irregular or improper, might also be admitted; and, particularly, that it would be a departure from the universal principle of law, which required the production of the best testimony which the nature of every case admitted, and

that the journals and records of congress were the best evidence of what votes had been given on any subject discussed before that body.

CHASE, Circuit Justice, then addressed himself to Mr. Nelson thus: Being very much pressed, by the young gentlemen who defend the traverser, to admit this testimony, I was going to recommend to you to permit those questions to be put to the witness, though they are certainly irregular. I wish you could consent that they should be propounded.

Mr. Nelson declared that he did not feel himself at liberty to consent to such a departure from legal principles.

Mr. Wirt then rose and addressed the jury. —He premised that the situation of the defendant and his counsel was extremely embarrassing; that as Mr. Callender had been presented, indicted, arrested and tried, during this term, he had not been able to procure the testimony essential to his defence, nor was his counsel prepared to defend him; and he insinuated that the conduct of the court was apparently precipitate, in not postponing the trial until the next term.

CHASE, Circuit Justice, told him he must not reflect on the court.

Mr. Wirt said, that his object was not to reflect on the court, but to apologize to the jury for the weakness of a defence which he was about to make.

After observing that his apology included the very reflection he denied, the court told him to proceed in his cause.

Mr. Wirt.—Gentlemen of the jury, I am prevented from explaining to you the causes which have conspired to weaken our defence, and it is no doubt right that I should be prevented, as the court have so decided. Permit me, then, gentlemen, to pass on abruptly to the law, under which we are indicted. You will find that a material part of your inquiry will relate to the powers of a jury over the subject committed to them, whether they have the right to determine the law, as well as the fact. In Virginia, an act of the assembly has adopted the common law of England; that common law, therefore, possesses in this state all the energy of a legislative act. By an act of congress, the rules of proceedings in the federal courts, in the several states, are directed to conform to the rules of the states in which such court may be in session; by that act of congress, it is therefore provided, that the practice of the courts of Virginia shall be observed in this court: to ascertain your power, therefore, as a jury, we have only to refer to the common law of England, which has been adopted in the laws of this state, and which defines the powers of juries in the state courts. By the common law of England, juries possess the power of considering and deciding the law as well as the fact, in every case which may come before them. I have no doubt but I shall receive the correction of the court, if I am

wrong in these positions. If, then, a jury in a court of the state would have a right to decide the law and the fact, so have you. The federal constitution is the supreme law of the land; and a right to consider the law, is a right to consider the constitution: if the law of congress under which we are indicted, be an infraction of the constitution, it has not the force of a law, and if you were to find the traverser guilty, under such an act, you would violate your oaths.

Here CHASE, Circuit Justice—Take your seat, sir, if you please. If I understand you rightly, you offer an argument to the petit jury, to convince them that the statute of congress. entitled, "An act, &c.," commonly called the "Sedition Law," is contrary to the constitution of the United States and, therefore, void. Now I tell you that this is irregular and inadmissible; it is not competent to the jury to decide on this point; but if you address yourselves, gentlemen, to the court, they will with pleasure hear any reasons you may offer, to show that the jury have the right contended for. Since I came into the commonwealth, I understood that this question would be stirred, and that the power of a jury to determine the validity or nullity of a law would be urged. I have, therefore, deliberately considered the subject, and I am ready to explain my reasons for concluding that the petit jury have not a right to decide on the constitutionality of a law, and that such a power would be extremely dangerous. —Hear my words: I wish the world to know them,—my opinion is the result of mature reflection.

(Here the judge then read part of a long opinion. to show that the jury had not the right contended for; after which, he told the counsel for the traverser, that he would hear with pleasure any arguments which could be urged to show that he was mistaken.)

Mr. Wirt.—I shall state to the court. in a few words, the reasons which have induced me to ascribe this right to the jury. They are sworn to give their verdict according to the evidence, and the law is evidence; if the jury have no right to consider the law, how is it possible for them to render a general verdict? Suppose, for example, an indictment for murder—how can the jury pronounce a verdict of guilty, or not guilty, if they have not the right as well of ascertaining whether the facts have been committed, as whether they amount to a breach of law? This doctrine is too clearly established to require the aid of authorities.

CHASE, Circuit Justice.—No man will deny your law—we all know that juries have the right to decide the law, as well as the fact—and the constitution is the supreme law of the land, which controls all laws which are repugnant to it.

Mr. Wirt.—Since, then, the jury have a right to consider the law, and since the constitution is law, the conclusion is certainly syllogistic, that the jury have a right to consider the constitution.

CHASE, Circuit Justice.—A non sequitur, sir.

Here Mr. Wirt sat down.

Mr. Nicholas then addressed the court. I am so much under the influence of duty that, though I am in the same situation with the gentleman who preceded me, and though the court seem to be impressed with the opinion, that the jury have no right to determine on the constitutionality of an act of congress, yet, arduous as the task may be, I shall offer a few observations to show that they have this right. I intend to defend Mr. Callender by the establishment of two points. First, that a law contrary to the constitution is void; and, secondly, that the jury have a right to consider the law and the fact. First, it seems to be admitted on all hands, that, when the legislature exercise a power not given them by the constitution, the judiciary will disregard their acts. The second point, that the jury have a right to decide the law and the fact, appears to me equally clear. In the exercise of the power of determining law and fact, a jury cannot be controlled by the court. The court have a right to instruct the jury, but the jury have a right to act as they think right; and if they find contrary to the directions of the court, and to the law of the case, the court may set aside their verdict and grant a new trial.

CHASE, Circuit Justice.—Courts do not claim the right of setting aside the verdict in criminal cases.

Mr. Nicholas.—From this right of the jury to consider law and fact in a general verdict, it seems to follow, that counsel ought to be permitted to address a jury on the constitutionality of the law in question;—this leads me back to my first position, that if an act of congress contravene the constitution of the United States, a jury have a right to say that it is null, and that they will not give the efficacy of a law to an act which is void in itself; believing it to be contrary to the constitution, they will not convict any man of a violation of it: if this jury believed that the sedition act is not a law of the land, they cannot find the defendant guilty. The constitution secures to every man a fair and impartial trial by jury, in the district where the fact shall have been committed: and to preserve this sacred right unimpaired, it should never be interfered with. If ever a precedent is established, that the court can control the jury so as to prevent them from finding a general verdict, their important right, without which every other right is of no value, will be impaired, if not absolutely destroyed. Juries are to decide according to the dictates of conscience and the laws of the country, and to control them would endanger the right of this most invaluable mode of trial. I have understood that some reliance would be placed on two decisions of the courts of this state, in which they determined two acts of our legislature to be unconstitutional; but when we come to analyze these decisions, they will not authorize the belief that the jury have not the

right I contend for—they only prove that the judiciary can declare legislative acts to be unconstitutional; they do not prove that a jury may not have a similar power. In the case of Kamper v. Hawkins [1 Va. Cas. 20] they refused to carry into effect a law which gave the district courts a right to grant injunctions in certain cases, because they thought it unconstitutional, and that the courts had no *power to act under the law: that case did not* turn on a relative view of the power and connection of a court and jury, it was a question whether the courts would exercise a particular jurisdiction, and carry into effect that act as practiced by the judges in chancery; but they never decided that a jury had not a right to determine on the constitutionality of a law, nor could a question about this right have arisen in those two cases; the court said that the judiciary were not bound to carry into effect an unconstitutional law. I do not deny the right of the court to determine the law, but I deny the right of the court to control the jury; though I have not bestowed a very particular attention on this subject, I am perfectly convinced that the jury have the right I contend for; and, consequently, that counsel have a right to address them on that subject. The act of congress to which I have alluded, appears to have given to the jury the power of deciding on the law and the fact; *and I trust, that when this whole question* comes into consideration, the court will suffer the counsel for the traverser to go on to speak to the jury, subject to the direction of the court.

Mr. Hay rose, after Mr. Nicholas concluded, and observed that he was prepared to address the court on the extent of the powers of the jury in the case at bar. The arguments, said he, which I shall urge, I shall address to the court, not wishing to be heard by the jury, or to be attended to by the numerous auditory now present. A question of great importance depends on this decision; much of the public happiness, of the public peace, of the public liberty, depend on the final decision which shall be pronounced on this subject. I entertained doubts at first; but a calm and dispassionate inquiry, and the most temperate investigation and reflection, have led me to believe and to say, that the jury have a right to determine every question *which is necessary to determine,* before sentence can be pronounced upon the traverser. I contend that the jury have a right to determine whether the writing charged in the indictment to be false, scandalous and malicious, be a libel or not. If this question should be decided in the affirmative by the court, I shall endeavour to convince the jury that it is not a libel, because there is no law in force under the government of the United States, which defines what a libel is, or prescribes its punishment. It is a universal principle of law, that questions of law belong to the court. and that the decision of facts belongs to the jury; but a jury have

a right to determine both law and fact in all cases.

Here Judge CHASE asked Mr. Hay whether he meant to extend his proposition to civil as well as criminal cases, and told him that if he did, the law was clearly otherwise.

Mr. Hay answered, that he thought the proposition universally true, but it was only necessary for him to prove it to be true in *cases of a criminal nature.*

Judge CHASE again interrupted Mr. Hay, and briefly expressed his opinion of the law. And then Mr. Hay folded up and put away his papers, seeming to decline any further argument.

Judge CHASE requested him to continue his argument, and added—"Please to proceed, and be assured that you will not be interrupted by me, say what you will."

Mr. Hay refused to proceed.

Judge CHASE observed, that though he thought it his duty to stop the counsel when mistaking the law, yet he did not wish to interrupt them improperly; that there was no occasion to be captious; and concluded thus, "Act as you please, sir."

Judge CHASE then proceeded.[4] I will assign my reasons why I will not permit the counsel for the traverser to offer arguments to the jury, to urge them to do what the constitution and law of this country will not *permit; and which, if I should allow, I* should, in my judgment, violate my duty, disregard the constitution and law, and surrender up the judicial power of the United States, that is, the power intrusted by the constitution to the federal courts, to a petit jury, in direct breach of my oath of office. The indictment charges that the traverser, on the 1st day of February, 1800, designing and intending to defame the president of the United States, and to bring him into contempt and disrepute, and *to excite the ha*tred of the good people of the United States against him, did wickedly and maliciously write, print, utter, and publish (or did cause or procure to be printed and published), a false, scandalous, and malicious writing, against the said president of the United States, of the tenor and effect stated in the indictment. On examining the indictment, it appears, that twenty separate and distinct, sets of words are set forth therein, as alle*gations or charges against the traverser.* He has plead "not guilty" to all of them. To support this indictment on behalf of the government of the United States, it must be proved to the jury; first, that the traverser did write, print, utter or publish, or did cause or procure to be printed or published, a false and scandalous writing against the president of the United States; secondly, that the said writing is false, scandalous, and malicious; and thirdly, that it was pub-

---

[4] "This charge was taken from the manuscript copy from which the judge read, the rest of the proceedings being taken in shorthand."

lished with intent to defame the president, &c., as stated in the statute and charged in the indictment. If these three facts shall be established to the satisfaction of the jury, they must find the traverser guilty, generally, unless he can prove to them the truth of the matter contained in the publication, in which case, the statute on which the traverser is indicted excuses him. If all the twenty sets of words, stated in the indictment as charges against the traverser, shall not be proved against him; or if he can prove that any of them are true, the jury will acquit him of such of them as shall not be established against him, and also of such of them as he can prove to be true; and they will find him guilty of the residue.

These inquiries, on behalf of the government of the United States, and on the part of the traverser, are proper for, and within the jurisdiction and the terms of the oath of the petit jury, who have been sworn "that they will well and truly try the issue joined between the United States and the traverser at the bar, and a true verdict give according to their evidence." The issue joined, therefore, is, whether the traverser is guilty of the several offences charged in the indictment; and to this issue no evidence is admissible (on the part of the government, or of the traverser) but what is pertinent or applicable to it. The petit jury, to discharge their duty, must first inquire, whether the traverser committed all or any of the facts alleged in the indictment to have been done by him, some time before the indictment. If they find that he did commit all or any of the said facts, their next inquiry is, whether the doing such facts have been made criminal and punishable by the statute of the United States, on which the traverser is indicted. For this purpose, they must peruse the statute, and carefully examine whether the facts charged and proved are within the provisions of it. If the words that create the offence are plain and intelligible, they must then determine whether the offence proved is of the species of criminality charged in the indictment; but if the words are ambiguous or doubtful, all construction should be rejected. The statute, on which the traverser is indicted, enacts "that the jury who shall try the cause shall have a right to determine the law and the fact, under the direction of the court, as in other cases." By this provision, I understand that a right is given to the jury to determine what the law is in the case before them; and not to decide whether a statute of the United States produced to them, is a law or not, or whether it is void, under an opinion that it is unconstitutional, that is, contrary to the constitution of the United States. I admit that the jury are to compare the statute with the facts proved, and then to decide whether the acts done are prohibited by the law; and whether they amount to the offence described in the indictment. This power the jury necessarily possesses, in order to enable them to decide on the guilt or innocence of the person accused. It is one thing to decide what the law is, on the facts proved, and another and a very different thing, to determine that the statute produced is no law. To decide what the law is on the facts, is an admission that the law exists. If there be no law in the case, there can be no comparison between it and the facts; and it is unnecessary to establish facts before it is ascertained that there is a law to punish the commission of them.

The existence of the law is a previous inquiry, and the inquiry into facts is altogether unnecessary, if there is no law to which the facts can apply. By this right to decide what the law is in any case arising under the statute, I cannot conceive that a right is given to the petit jury to determine whether the statute (under which they claim this right) is constitutional or not. To determine the validity of the statute, the constitution of the United States must necessarily be resorted to and considered, and its provisions inquired into. It must be determined whether the statute alleged to be void, because contrary to the constitution, is prohibited by it expressly, or by necessary implication. Was it ever intended, by the framers of the constitution, or by the people of America, that it should ever be submitted to the examination of a jury, to decide what restrictions are expressly or impliedly imposed by it on the national legislature? I cannot possibly believe that congress intended, by the statute, to grant a right to a petit jury to declare a statute void. The man who maintains this position must have a most contemptible opinion of the understanding of that body; but I believe the defect lies with himself. If any one can be so weak in intellect as to entertain this opinion of congress, he must give up the exercise of the power, when he is informed that congress had no authority to vest it in any body whatsoever; because, by the constitution, (as I will hereafter show,) this right is expressly granted to the judicial power of the United States, and is recognized by congress by a perpetual statute. If the statute should be held void by a jury, it would seem that they could not claim a right to such decision under an act that they themselves consider as mere waste paper. Their right must, therefore, be derived from some other source.

It appears to me that all the rights, powers, and duties of the petit jury, sworn in this cause, can only be derived from the constitution, or statutes of the United States made agreeably to it; or from some statute of this commonwealth not contrary to the federal constitution or statutes of congress; or from the common law, which was adopted by the federal constitution in the case of trials by jury in criminal cases. It never was pretended, as I ever heard, before this time, that a petit jury in England (from whence

our common law is derived,) or in any part of the United States ever exercised such power. If a petit jury can rightfully exercise this power over one statute of congress, they must have an equal right and power over any other statute, and indeed over all the statutes; for no line can be drawn, no restriction imposed on the exercise of such power; it must rest in discretion only. If this power be once admitted, petit jurors will be superior to the national legislature, and its laws will be subject to their control. The power to abrogate or to make laws nugatory, is equal to the authority of making them. The evident consequences of this right in juries will be, that a law of congress will be in operation in one state and not in another. A law to impose taxes will be obeyed in one state, and not in another, unless force be employed to compel submission. The doing certain acts will be held criminal, and punished in one state, and similar acts may be held innocent, and even approved and applauded in another. The effects of the exercise of this power by petit jurors may be readily conceived. It appears to me that the right now claimed has a direct tendency to dissolve the union of the United States, on which, under Divine Providence, our political safety, happiness, and prosperity depend.

No citizen of knowledge and information, unless under the influence of passion or prejudice, will believe, without very strong and indubitable proof, that congress will, intentionally, make any law in violation of the federal constitution, and their sacred trust. I admit that the constitution contemplates that congress may, from inattention or error in judgment, pass a law prohibited by the constitution; and, therefore, it has provided a peaceable, safe, and adequate remedy. If such a case should happen, the mode of redress is pointed out in the constitution, and no other mode can be adopted without a manifest infraction of it. Every man must admit that the power of deciding the constitutionality of any law of the United States, or of any particular state, is one of the greatest and most important powers the people could grant. Such power is restrictive of the legislative power of the Union, and also of the several states; not absolute and unlimited, but confined to such cases only where the law in question shall clearly appear to have been prohibited by the federal constitution, and not in any doubtful case. On referring to the ninth section of the first article of the constitution, there may be seen many restrictions imposed on the powers of the national legislature, and also on the powers of the several state legislatures. Among the special exceptions to their authority, is the power to make ex post facto laws, to lay any capitation, or other direct tax, unless in proportion to the census; to lay any tax or duty on articles exported from any state, &c. &c. It should be remembered that the judi-

cial power of the United States is co-existent, co-extensive, and co-ordinate with, and altogether independent of, the federal legislature, or the executive. By the sixth article of the constitution, among other things, it is declared that the constitution shall be the supreme law of the land. By the third article, it is established "that the judicial power of the United States shall be vested in one supreme court, and in such other inferior courts as congress may from time to time ordain and establish; and that the judicial power shall extend to all cases in law and equity, arising under the constitution and laws of the United States."

Among the cases which may arise under the constitution, are all the restrictions on the authority of congress, and of the state legislatures. It is very clear, that the present case arises under the constitution, and also under a law of the United States, and therefore it is the very case to which the constitution declares the judicial powers of the United States shall extend. It is incontrovertible that the constitution is the supreme law, and therefore, it must be the rule by which the federal and state judges are bound to regulate their decisions. By the sixth article of the constitution, it is provided (among other things) that all members of congress, and of the several state legislatures, and all judicial officers of the United States, and of the several states, shall be bound by an oath or affirmation to support the constitution. By this provision, I understand that every person, so sworn or affirmed, promises that he will preserve the constitution as established, and the distribution of powers thereby granted; and that he will not assent to any amendment or alteration thereof, but in the mode prescribed in the fifth article; and that he will not consent to any usurpation by any one branch of the legislature upon the other, or upon the executive, or by the executive upon either branch, or by any department or officer of government, of the power granted to another; or that the power granted to either shall be exercised by others. I also understand by this engagement, that the person taking it, promises also that he will oppose by his example, argument, advice, and persuasion, and by all other means in his power, force only excepted, any design, advice or attempt to impair or destroy the constitution. If this exposition of this solemn obligation is substantially correct, I cannot believe that any person having the same understanding of it, will maintain that a petit jury can rightfully exercise the power granted by the constitution to the federal judiciary.

From these considerations I draw this conclusion, that the judicial power of the United States is the only proper and competent authority to decide whether any statute made by congress (or any of the state legislatures) is contrary to, or in violation of, the federal constitution. That this was the opinion of

the senate and house of representatives, and of General Washington, then president of the United States, fully appears by the statute, entitled "An act to establish the judicial courts of the United States," made at the first session of the first congress (on 24th September, 1789, chapter 20, § 8 [1 Stat. 76]), which enacts, "that the justices of the supreme courts, and the district judges, shall take an oath or affirmation in the following words, to wit: 'I. A. B., do solemnly swear or affirm, that I will administer justice without respect to persons, and do equal right to the poor and to the rich, and that I will faithfully and impartially discharge and perform all the duties incumbent on me as ——, according to the best of my abilities and understanding, agreeably to the constitution and laws of the United States.'" No position can be more clear than that all the federal judges are bound by the solemn obligation of religion, to regulate their decisions agreeably to the constitution of the United States, and that it is the standard of their determination in all cases that come before them. I believe that it has been the general and prevailing opinion in all the Union, that the power now wished to be exercised by a jury, properly belonged to the federal courts. It was alleged that the tax on carriages was considered by the people of this commonwealth to be unconstitutional, and a case was made to submit the question to the supreme court of the United States, and they decided that the statute was not unconstitutional, and their decision was acquiesced in. I have seen a report of a case (Kamper v. Hawkins [supra]), decided in 1793, in the general court of this commonwealth, respecting the constitutionality of a law which gave the district courts a power of granting injunctions in certain cases, in which case the judges of the general court (four to one) determined that the law was unconstitutional and void. On yesterday I saw the record of another case, in the court of appeals of this commonwealth (in 1788), on which it appears that the general assembly passed "An act to establish district courts," and the judges (ten being present), adjudged "that the constitution and the said act were in opposition, and could not exist together, and that the court ought not to do anything officially in the execution of an act, which appeared to be contrary to the spirit of the constitution." I also observed, that the then governor, Mr. Edmund Randolph, immediately on this decision, called the general assembly by proclamation; and I have been informed that they altered the law according to the opinion of the court. From these two decisions, in the two highest courts of justice in this state, I may fairly conclude, that, at that period, it was thought that the courts of justice were the proper judicature to determine the constitutionality of the laws of this commonwealth. It is now contended, that the constitutionality of the

laws of congress should be submitted to the decision of a petit jury. May I ask, whence this change of opinion? I declare that the doctrine is entirely novel to me, and that I never heard of it before my arrival in this city. It appears to me to be not only new, but very absurd and dangerous, in direct opposition to, and a breach of the constitution. And I wish those who maintain this doctrine, and have sworn to support the constitution, conscientiously to reconsider their opinions with a calm and deliberate temper, and with minds disposed to find the truth, and to alter their opinion if convinced of their error. It must be evident, that decisions in the district or circuit courts of the United States will be uniform, or they will become so by the revision and correction of the supreme court; and thereby the same principles will pervade all the Union; but the opinions of petit juries will very probably be different in different states.

The decision of courts of justice will not be influenced by political and local principles, and prejudices. If inferior courts commit error, it may be rectified; but if juries make mistakes, there can be no revision or control over their verdicts, and therefore, there can be no mode to obtain uniformity in their decisions. Besides, petit juries are under no obligation by the terms of their oath, to decide the constitutionality of any law; their determination, therefore, will be extra judicial. I should also imagine, that no jury would wish to have a right to determine such great, important, and difficult questions; and I hope no jury can be found, who will exercise the power desired over the statutes of congress, against the opinion of the federal courts.

I have consulted with my brother, Judge GRIFFIN, and I now deliver the opinion of the court, "That the petit jury have no right to decide on the constitutionality of the statute on which the traverser is indicted; and that, if the jury should exercise that power, they would thereby usurp the authority entrusted by the constitution of the United States to this court." Governed by this opinion, the court will not allow the counsel for the traverser to argue before the petit jury, that they have a right to decide on the constitutionality of the statute, on which traverser stands indicted. If the counsel for the traverser had offered sufficient arguments to the court, to show that the petit jury had this right, the court, on being convinced that the opinion delivered was erroneous, would have changed it; for they hold it a much greater reproach for a judge to continue in his error, than to retract. The gentlemen of the profession know, that questions have sometimes occurred in the state courts, whether acts of assembly had expired, or had been repealed; but no one will say that such questions were ever submitted to a jury. If the constitution of the United States had not given to the judiciary a right

to decide on the constitutionality of federal laws—yet, if such power could be exercised, it could not be by a juror, from this consideration—it is a maxim of law in all the states, that the courts have the exclusive right to decide every question, as to the admissibility of evidence in every case, civil or criminal, whether the evidence be by act of assembly, or by deed, or other writing, or by witnesses.

Judge CHASE concluded with observing, that, if he knew himself, the opinion he had delivered and the reasons offered in its support, flowed not from political motives, or reasons of state, with which he had no concern, and which he conceived never ought to enter courts of justice; but from a deliberate conviction of what the constitution and the law of the land required. "I hold myself equally bound," said he, "to support the rights of the jury, as the rights of the court." I consider it of the greatest consequence to the administration of justice, that the powers of the court, and the powers of the petit jury, should be kept distinct and separate. I have uniformly delivered the opinion, "that the petit jury have a right to decide the law as well as the fact, in criminal cases;" but it never entered into my mind that they, therefore, had a right to determine the constitutionality of any statute of the United States. It is my duty to execute the laws of the United States with justice and impartiality, with firmness and decision, and I will endeavour to discharge this duty with the assistance of the Fountain of Wisdom, and the Giver of all human reason and understanding.

After two hours, the jury returned with a verdict of guilty, upon which the court sentenced the traverser to a fine of two hundred dollars, and an imprisonment of nine months.

NOTE I. The tempest which this trial excited can now hardly be understood. The papers, for the first time in our history, were crammed with detailed reports, in which evidence and speeches were given at large. Virginia was in a flame: for even before the trial, affidavits were circulated in which it was stated that upon starting for Richmond, Judge Chase had publicly announced that "he would teach the lawyers in Virginia the difference between the liberty and the licentiousness of the press" (see Chase's Trial, 43); and that he had told the marshal "not to put any of those creatures called Democrats on the jury" (Id. 44). In his usual coarse jocularity, he had likened himself to a schoolmaster, who, breaking into the chamber of a few unruly boys, was about to reduce their notions of their own importance by a little wholesome chastisement: and his auditors roared at the picture of the burly judge, stretching in turn the representatives of the Virginia chivalry over his knee, and then sending them off one by one, cured by the same vigorous application. Judge Chase's peculiar recklessness of manner during the trial, can only be explained on the principle that, possessed with this notion, he was determined to do all that he could do, to humiliate and degrade the spirited bar which was called around him. He had hardly entered into the court house, before he saw that the most distinguished lawyers even in that most distinguished body had been pitched

upon to conduct the defence; and he could not but feel that the crowd with which the room was filled, was attracted much more by the struggle to take place between the court and the counsel, than that between the prosecution and the prisoner. He thought it was better to settle the matter at once; and it must be confessed that the slap he gave Mr. Nicholas and Mr. Hay at the outset—something so far beyond anything they had ever calculated on as possible in judicial warfare—completely deprived those two eminent lawyers of their self possession. He had them down, and soon after adding Mr. Wirt to their number—whom he called a "young man," telling him to sit down, though that most courteous and eloquent counsel was then nearly middle aged. a widower, with a family of children—he proceeded to tuck them under his elbow, and at his leisure to apply to them that correction which he had promised. How richly he did so, the trial in the text amply shows. But not only all Virginia, but the profession throughout the country, was stung to the quick. The Philadelphia bar, as has been already noticed, was aroused by a similar invasion of its prerogative; and for a long time counsel declined to appear before the judge who had thus violated, as they alleged, the decorum of his office. At the very moment a determination was avowed to obtain an impeachment, and at last, in January, 1804, Mr. Randolph rose in the house of representatives, and made the long-expected charges. At another period, it will probably be necessary to consider at large this memorable trial; and in the preliminary notes to this work, an outline of Judge Chase's life has been given in which the general character of the proceeding is noticed. At present it is enough to consider its relation to the present case. Five articles of the impeachment were based on Callender's trial, and of these the fate was as follows: Art. II. Misconduct in refusing to overrule the objection to John Bassett, as a juror. Guilty, 10; not guilty, 24. Art. III. Misconduct in refusing to permit Mr. Taylor to be examined. Guilty, 18; not guilty, 16. Art. IV. Rude, contemptuous, and indecent conduct during the trial. Guilty, 18; not guilty, 16. Art. V. Misconduct in issuing bench warrant, instead of summons. Guilty, none; not guilty, 34. Art. VI. Misconduct in refusing continuance. Guilty, 4; not guilty, 30. On the third and fourth articles nothing but Judge Chase's age, and the peculiar party sympathies of the senate, saved him, as was conceded at the time, from a conviction by the requisite majority of two-thirds. The fourth article, it is true, rested on the abuse of a discretionary power, not susceptible, perhaps, of exact legal measurement: but the rejection of Mr. Taylor's testimony, on which the second article hung, was a palpable and unprecedented violation of the law of evidence. Mr. Taylor was offered to prove the truth of one of the several allegations in the alleged libellous article; the sedition act provided that the defendant should be permitted to give the truth in evidence; Judge Chase refused to allow Mr. Taylor to be examined, because it was no defence to justify part of the libellous matter; it was necessary that there should be a justification of the whole. In other words, a witness was rejected, who proved a material part of the defendant's case, simply because the particular witness was not able to prove the whole of it. Callender himself, like all the other subjects of the sedition law, was a foreigner, and was as depraved in morals as he was malignant in temper. "He seemed to have been a man," says Mr. Harrison, the accomplished historian of Virginia (2 Hist. Va. 373), "in whose heart vindictive passion raged without control." The "Prospect Before Us," from which the libellous matter in the text was extracted, is now, as it was then by all honourable minds, surrendered to infamy, and the only regret is, that a creature so contemptible should have been temporarily honoured by the fires of a martyrdom like that which the present trial inflicted. Mr.

Tucker (2 Life of Jefferson, 120), after mentioning that, on Mr. Jefferson's accession, he refused Callender the office of postmaster at Richmond, thus states the sequel of his history: "It should be further mentioned that Mr. Jefferson, as soon as he became president, exercised his powers of pardon in favour of Callender, as well as all others who had been convicted under the sedition law, and were then undergoing sentence of imprisonment. He took great offence at the refusal, and in no long time was found writing in opposition to the new administration; and he openly justified his desertion, on the ground of the ill-treatment he had received from Mr. Jefferson. He was of course welcomed by the new allies, and having connected himself with the editor of an obscure journal, recently established in Richmond, (the Recorder,) he poured forth against the Republican party generally, and Mr. Jefferson in particular, a torrent of scurrility and slander, of which no example had been previously afforded in the United States, not even by himself. The private life of Mr. Jefferson, present and past, was the subject of the closest scrutiny; and, whenever he was believed to be vulnerable, no matter for what cause, or upon what evidence, he was unhesitatingly assailed in the grossest and most offensive way. Such, too, are the debasing effects of party malignity, that there were not wanting those of the Federal party who were panders to this writer's vindictive calumnies, and communicated every piece of scandal or gossip, no matter how unfit for the public eye, how unsupported by evidence, or improbable in itself, which was thought at all likely to lower the chief magistrate in the eyes of the nation. The paper which was the vehicle of these slanders, and which previously circulated scarcely out of Richmond, now found its way to the remotest parts of the Union. It remains to be added that, while this wretched libeller, who had now become an habitual sot, was disseminating his slanders and ribaldry with untiring virulence, he was one morning found drowned in James' River, where he had been bathing, it was supposed, in a state of intoxication."

The following letters of Mr. Jefferson are here of some interest:

### Mr. Jefferson to Mr. Monroe.

#### (3 Jeff. Corres. 503.)

"Washington, July 15th, 1802. Dear Sir:— Your favour of the 7th has been duly received. I am really mortified at the base ingratitude of Callender. It presents human nature in a hideous form. It gives me concern, because I perceive that relief, which was afforded him on mere motives of charity, may be viewed under the aspect of employing him as a writer. When 'The Political Progress of Britain' first appeared in this country, it was in a periodical publication called the Bee, where I saw it. I was speaking of it in terms of strong approbation to a friend in Philadelphia, when he asked me if I knew that the author was there in the city, a fugitive from prosecution on account of that work, and in want of employ for his subsistence. This was the first of my learning that Callender was the author of the work. I considered him as a man of science fled from persecution, and assured my friend of my readiness to do whatever I could to serve him. It was long after this, before I saw him; probably not till 1798. He had in the mean time written a second part of the 'Political Progress,' much inferior to the first, and his 'History of the United States.' In 1798, I think, I was applied to by Mr. Leiper to contribute to his relief. I did so. In 1799. I think, S. T. Mason applied for him. I contributed again. He had by this time paid me two personal visits. When he fled in a panic from Philadelphia to General Mason's, he wrote to me that he was a fugitive in want of employ, wished to know if he could get into a counting house or school, in my neighborhood, or that of Richmond; that he had ma-

terials for a volume, and if he could get as much money as would buy the paper, the profit of the sale would be all his own. I availed myself of this pretext to cover a mere charity, by desiring him to consider me a subscriber for as many copies of his book as the money enclosed ($50) amounted to; but to send me two copies only, as the others might lay until called for. But I discouraged his coming into my neighborhood. His first writings here had fallen far short of his original 'Political Progress,' and the scurrilities of his subsequent ones began evidently to do mischief. As to myself, no man wished more to see his pen stopped; but I still considered him as a proper object of benevolence. The succeeding year he again wanted money to buy paper for another volume. I made his letter, as before, the occasion of giving him another fifty dollars. He considers these as proofs of my approbation of his writings, when they were mere charities, yielded under a strong conviction that he was injuring us by these writings. It is known to many that the sums given him were such, and even smaller than I was in the habit of giving to others in distress, of the Federal as well as the Republican party, without attention to political principles. Soon after I was elected to the government, Callender came on here, wishing to be made postmaster of Richmond. I knew him to be totally unfit for it, and however ready I was to aid him with my own charities (and I then gave him fifty dollars), I did not think the public offices were confided to me to give away as charities. He took it in mortal offence, and from that moment has been hauling off to his former enemies, the Federalists. Besides the letter I wrote him in answer to the one from General Mason's, I wrote him another containing answers to two questions he addressed me. 1st. Whether Mr. Jay received salary as chief justice and envoy at the same time? and, 2d. Something relative to the expenses of an embassy to Constantinople. I think these were the only letters I ever wrote him, in answer to volumes he was perpetually writing to me. This is the true state of what has passed between him and me. I do not know that it can be used without committing me in controversy, as it were, with one too little respected by the public to merit that notice. I leave to your judgment what use can be made of these facts."

### Mr. Jefferson to Mrs. Adams.

#### (4 Jeff. Corres. 23.)

"Washington, July 22d. 1804. Dear Madam: —Your favour of the 1st instant was duly received, and I would not again have intruded on you, but to rectify certain facts which seem not to have been presented to you under their true aspect. My charities to Callender are considered as rewards for his calumnies. As early, I think, as 1796, I was told in Philadelphia that Callender, the author of the 'Political Progress of Britain,' was in that city, a fugitive from persecution, having written that book, and in distress. I had read and approved the book; I considered him as a man of genius, unjustly persecuted. I knew nothing of his private character, and immediately expressed my readiness to contribute to his relief, and to serve him. It was a considerable time after that, on application from a person who thought of him as I did, I contributed to his relief, and afterwards repeated the contribution. Himself I did not see till long after, nor ever more than two or three times. When he first began to write, he told some useful truths in his coarse way; but nobody sooner disapproved of his writing than I did, or wished more that he should be silent. My charities to him were no more meant as encouragements to his scurrilities, than those I gave to the beggar at my door, are meant as rewards for the vices of his life, and to make them chargeable to myself. In truth, they would have been greater to him, had he never written a word, after the work for which he fled from Britain. With re-

spect to the calumnies of writers and printers at large, published against Mr. Adams, I was as far from stooping to any concern or approbation of them as Mr. Adams was respecting those of Porcupine, Fenno, or Russell, who published volumes against me for every sentence rendered by their opponents against Mr. Adams. But I never supposed Mr. Adams had any participation in the atrocities of these editors, or their writers. I knew myself incapable of that base warfare, and believed him to be so. On the contrary, whatever I may have thought of the acts of the administration of that day, I have ever borne testimony to Mr. Adams' personal worth; nor was it ever impeached in my presence without a just vindication on my part. I never supposed that any person who knew either of us, could believe that either of us meddled in that dirty work. But another fact is, that I liberated a wretch who was suffering for a libel against Mr. Adams! I do not know who was the particular wretch alluded to; but I discharged every person under punishment or prosecution under the sedition law, because I considered, and now consider, that law to be a nullity as absolute and as palpable as if congress had ordered us to fall down and worship a golden image. It was accordingly done in every instance, without asking what the offenders had done, or against whom they had offended, but whether the pains they were suffering were inflicted under the pretended sedition law. It was certainly possible that my motives for contributing to the relief of Callender, and liberating under the sedition law, might have been to protect, encourage, and reward slander; but they may also have been those which inspire ordinary charities to objects of distress, meritorious or not, or the obligation of an oath to protect the constitution, violated by an unauthorized act of congress. Which of these were my motives, must be decided by a regard to the general tenor of my life. On this I am not afraid to appeal to any nation at large, to posterity, and still less to that Being who sees himself our motives, who will judge us from his own knowledge of them, and not on the testimony of Porcupine or Fenno. You observe, there has been one other act of my administration personally unkind, and suppose it will readily suggest itself to me. I declare, on my honour, madam, I have not the least conception what act is alluded to. I never did a single one with an unkind intention. My sole object, in this letter, being to place before your attention, that the acts imputed to me are either such as are falsely imputed, or as might flow from good as well as bad motives, I shall make no other addition than the assurance of my continued wishes for the health and happiness of yourself and Mr. Adams."

[NOTE 2. Subsequently, upon the trial of the impeachment of Mr. Justice Chase, before the senate of the United States, the second article charged Judge Chase with overruling the objection of John Basset, who wished to be excused from serving on the jury in the trial of Callender, and causing him to be sworn, and to serve on the said jury, by whose verdict Callender was convicted.

[Basset had expressed no wish to be excused, provided there would be no impropriety in his being sworn, but from a delicate scruple he informed the court, that he had seen in the newspapers, extracts said to be taken from "The Prospect Before Us:" that he had no knowledge whether they were truly extracted, but if they were and the context did not explain away the apparent meaning of the extracts, he had made up his opinion unequivocally that their author came within the provisions of the sedition law.] 5

UNITED STATES (CALLENDER v.). See Case No. 2,321.